## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MUSKET CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-11-444-M |
| | ) | |
| STAR FUEL OF OKLAHOMA, LLC, | ) | |
| LINCOLN O. CLIFTON, DAVID A. | ) | |
| SELPH, and MARK LUITWIELER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case is scheduled for trial on the Court's October 2012 trial docket.

Before the Court is defendant Mark Luitwieler's ("Luitwieler") Motion for Summary Judgment, filed March 8, 2012. On April 5, 2012, plaintiff Musket Corporation ("Musket") filed its response. Also before the Court is defendants Lincoln Clifton ("Clifton") and David Selph's ("Selph") Motion for Summary Judgment, filed March 8, 2012. On April 6, 2012, Musket filed its response, and on April 20, 2012, Clifton and Selph filed their reply. Finally, before the Court is Musket's Motion for Partial Summary Judgment, filed March 8, 2012. On April 5, 2012, defendant Star Fuel of Oklahoma, LLC ("Star Fuel") filed its response, and on April 20, 2012, Musket filed its reply. Based upon the parties' submissions, the Court makes its determination.

I.      Background

Star Fuel is a reseller of gasoline. Star Fuel purchases gasoline from wholesale suppliers for resale to Star Fuel's customers, such as convenience stores. At all times relevant, Star Fuel's primary contact at Musket was Luitwieler, Musket's Manager of Ethanol Business Development. During his employment with Musket, Luitwieler was responsible for fuel marketing. In addition to other duties, Luitwieler was authorized to buy gasoline for resale to third parties subject to certain

conditions and Musket policies. Luitwieler was also authorized to set the price for the gasoline he was reselling for Musket at any price, as long as it made Musket a profit. However, according to Musket, Luitwieler did not have the authority to act as a fuel "trader" speculating on fluctuating fuel prices by committing Musket to purchase large amounts of fuel at a fixed price and holding it for long periods of time without inputting the purchase of the fuel in Musket's fuel trade capture and risk management system.

In an email dated April 4, 2008 from Luitwieler to Clifton, Luitwieler proposed that Musket and Star Fuel share the risk on two proposed April 2008 contracts for the purchase of gasoline. Luitwieler proposed that Musket would buy the gasoline and Star Fuel would resell it to its customers. Luitwieler further proposed Musket and Star Fuel would either: (1) share the profits or losses equally, or (2) Musket would add a penny to each gallon and pass all the risk to Star Fuel. Musket and Luitwieler contend that Star Fuel agreed to this profit/loss sharing arrangement proposed by Luitwieler and that Musket and Star Fuel bought and re-sold gasoline numerous times between March 2008 and June 2008 pursuant to this agreement. Star Fuel, Clifton, and Selph, on the other hand, contend that Star Fuel rejected Luitwieler's proposal. Specifically, Star Fuel contends that James Roosa, an employee of Star Transport, LLC, a Star Fuel affiliate, told Luitwieler that Star Fuel was not in the business of speculating on gasoline and requested that Luitwieler just quote Star Fuel a specific price. Star Fuel further contends that from March 2008 through June 2008, Musket asked Star Fuel on multiple occasions to resell gasoline that Musket had in its inventory and that in response to each proposal, Star Fuel either accepted or declined to resell the gasoline depending on the price being offered by Musket. None of the March-June 2008 transactions suffered a loss, and each transaction was profitable.

2

On July 3, 2008 and July 17, 2008, Luitwieler purchased 840,000 gallons of fuel allegedly based upon the alleged agreement between Musket and Star Fuel, whereby Musket and Star Fuel agreed to share equally in all profits and losses derived from the sale of this fuel.  Luitwieler believed that he received pre-authorization from Star Fuel to purchase the 840,000 gallons of gasoline that he purchased on July 3, 2008 and July 17, 2008.  During July and August 2008, Luitwieler repeatedly advised his Musket co-workers and superiors that Star Fuel had committed to purchase the 840,000 gallons of gasoline at a price of $3.35/gallon.

Over the next month, a proposed Settlement Agreement relating to an unrelated dispute was drafted, which included language in the mutual release that expressly excluded from the release "that certain August Fixed Price Gasoline Contract dated August 4, 2008."  The parties dispute whether Star Fuel was aware that the contract referenced in the exclusion was the alleged contract between Musket and Star Fuel whereby Star Fuel allegedly agreed to purchase the 840,000 gallons of gasoline at a price of $3.35/gallon.  On September 10, 2008, the Settlement Agreement was executed by the parties.

Luitwieler subsequently left Musket and began work at Star Fuel as its Director of Supply and Logistics.  The parties dispute when Luitwieler actually began working for Star Fuel.  Musket asserts that Luitwieler began working for Star Fuel on September 12, 2008.  Star Fuel contends that Luitwieler did not begin working for Star Fuel until nearly a week later.  In his position with Star Fuel, Luitwieler was charged with overseeing Star Fuel's unbranded wholesale business and was authorized to, amongst other things, purchase fuel from third parties for resale to Star Fuel's customers.

On September 12, 2008, Luitwieler contacted Musket and represented that Star Fuel would be pulling 840,000 gallons of gasoline from Musket's inventory over the next few days at a price of $3.35/gallon. Luitwieler now claims that he was not authorized to make this statement to Musket and was doing so only in his individual capacity. Over the next few days and weeks, Luitwieler allegedly made several other representations to Musket regarding Star Fuel's intention to take possession of the 840,000 gallons of gasoline and pay a purchase price of $3.35/gallon for the same. On October 16, 2008, Star Fuel informed Musket that it was Star Fuel's position that it had no obligation to purchase the 840,000 gallons of gasoline and would not do so. Musket states that on November 5, 2008, it sold the 840,000 gallons of gasoline to G.E. Warren at a price of $1.4075/gallon.

Prior to leaving Musket, Luitwieler obtained a software program called "IDrive" and used it to upload information from his company laptop to an online backup drive. Musket asserts that the use of IDrive and the uploading of data was not authorized by Musket. Musket further asserts that Luitwieler uploaded confidential trade secret information. Specifically, Musket asserts that many of the documents taken by Luitwieler contain highly confidential and proprietary trade secret information that would be competitively useful to Luitwieler in his new role as the Director of Supply and Logistics at Star Fuel and could be used by Luitwieler and Star Fuel to directly compete with Musket by soliciting its customers or by using Musket's information to adopt similar business strategies. Later, after going to work at Star Fuel, Luitwieler downloaded his information from his IDrive account to his Star Fuel laptop. Additionally, Luitwieler organized a select portion of the files into a folder he named "Musket Folders," which contained additional subfolders with titles such as "Bus Dev," "Customers," and "FORMS."

II.     Summary Judgment Standard

"Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The moving party is entitled to summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  When applying this standard, [the Court] examines the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 156 F.3d 1068, 1071-72 (10th Cir. 1998) (internal citations and quotations omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Furthermore, the non-movant has a burden of doing more than simply showing there is some metaphysical doubt as to the material facts.  Rather, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) (internal citations and quotations omitted).

III.    Discussion

In their motion, Clifton and Selph move for summary judgment as to Musket's claims for "suit on Clifton Guaranty" (Count Six) and "suit on Selph Guaranty" (Count Seven).  Additionally, Clifton and Selph move for summary judgment as to the underlying contract and tort claims for which Musket is seeking to hold Clifton and Selph liable through the personal guarantees.  In his motion, Luitwieler moves for summary judgment as to Musket's fraud claims, misappropriation of trade secrets claim, breach of the non-disclosure agreement claim, unfair competition claim, and

violation of the Computer Fraud and Abuse Act claim.  Finally, in its motion for partial summary

judgment, Musket moves for partial summary judgment on its Ninth Cause of Action for

conspiracy/fraud against Luitwieler and Star Fuel.

> A. Guaranty Claims

In the fall of 2007, Star Fuel completed a Credit Application and Agreement provided by

Musket for the purposes of obtaining a line of credit from Musket.  Below the application, on the

same page, Clifton and Selph executed a Personal Guarantee.  The Personal Guarantee provides:

> For valuable consideration, the receipt of which is acknowledged,
> including but not limited to the extension of credit by Musket
> Corporation to the Applicant described above [Star Fuel], the
> undersigned individually, jointly and severally, unconditionally
> guarantee(s) to Musket Corporation the full and prompt payment and
> performance by Applicant of all obligations which Applicant
> presently or hereafter may have to Musket Corporation.  Guarantor
> agrees to indemnify Musket Corporation against any losses Musket
> Corporation may sustain and expenses Musket Corporation may incur
> as a result of any failure of Applicant to perform any such obligation
> of [sic] failure of any of the undersigned to perform their respective
> obligations under this Personal Guarantee, including reasonable
> attorneys' fees and all costs and other expenses incurred in collecting
> or compromising any indebtedness of Applicant guaranteed
> hereunder and in enforcing this guaranty against guarantor.  This
> shall be a continuing Guaranty of payment and performance.
> Diligence, demand, protest and notice of any kind, as well as all other
> defenses available to sureties and/or guarantors are hereby waived.

This Personal Guarantee shall remain in full force until guarantor delivers to Musket Corporation
written notice revoking this Personal Guarantee as to indebtedness incurred subsequent to such
delivery.  Such delivery shall not affect any obligations of any of the undersigned under this
Personal Guarantee with respect to indebtedness theretofore incurred.

> The undersigned personal guarantor, recognizing that his or her
> individual credit history may be a necessary factor in the evaluation
> of the proposed credit to be extended to Applicant and this personal
> guarantee, hereby consents to and authorizes Musket Corporation to
> obtain a consumer credit report on the undersigned, from time to time

> as Musket Corporation may reasonably deem necessary or appropriate.

Personal Guarantee, attached as Exhibit 1 to Clifton and Selph's Motion for Summary Judgment and Brief in Support.

Musket alleges causes of action based upon the Personal Guarantee signed by Clifton and Selph.  Based upon the Personal Guarantee, Musket contends that Clifton and Selph are liable for damages arising from Star Fuel's refusal to complete the purchase of the 840,000 gallons of gasoline Musket contends it purchased on Star Fuel's behalf.  Musket further contends that Clifton and Selph are liable for damages arising out of Star Fuel's alleged misstatements concerning said purchase.  Finally, Musket contends that the language of the Personal Guarantee would include any future judgment arising from conduct during the term of the Personal Guarantee that Star Fuel is obligated to pay to Musket.  Clifton and Selph assert that the Personal Guarantee does not cover Musket's contractual claims or Musket's non-contractual tort claims.

> A guaranty, in its common acceptation, is understood to mean an undertaking to answer for the payment of some debt, or the performance of some duty, of another, in the case of a failure of such other to pay or perform.  A guaranty is generally understood to be a collateral undertaking or liability, rather than a direct one, because the guarantor agrees to pay only in the case of the default of the party to whom goods are furnished or credit is extended.

*Cranford v. Bartlett*, 25 P.3d 918, 923 (Okla. 2001) (internal citations omitted).

> Generally, the promise to stand for the debt of another is purely contractual and collateral to that of the principal debtor.  Intent at execution controls the meaning of the written terms and the extent of the obligation is defined by the promise given.  Contract language is accorded its plain and ordinary meaning absent a term intended to carry a specific technical meaning.

> The parties' intent in executing a guaranty contract is gathered from the entire instrument.  Extrinsic evidence need not be introduced

> when the language is clear and explicit.  If the contract is complete in itself and, viewed in its entirety unambiguous, its language is the only legitimate evidence of intent.  The courts decide, as a matter of law, whether a contract provision is ambiguous.  Absent illegality, the parties are free to bargain as they see fit, and this Court will neither make a new contract or rewrite existing terms.  Finally, under Oklahoma law, guaranty agreements are construed most strongly against the guarantor.

*JPMorgan Chase Bank, N.A. v. Speciality Rests., Inc.*, 243 P.3d 8, 12-13 (Okla. 2010) (internal citations omitted).

Having carefully reviewed the Personal Guarantee, the Court finds that the language of the Personal Guarantee is clear and explicit and is not ambiguous.  The Court further finds that said language is fairly broad in its scope regarding Clifton and Selph's liability.  Under the express terms of the Personal Guarantee, Clifton and Selph unconditionally guarantee the full and prompt payment and performance of "all obligations" Star Fuel "presently or hereafter" may have to Musket.  Further, under the Personal Guarantee, Clifton and Selph agree to indemnify Musket against "any losses" Musket may sustain as a result of any failure of Star Fuel to perform any such obligations.  Based upon the broad language of the Personal Guarantee, the Court finds that the Personal Guarantee does encompass Musket's contractual claims.  However, based upon the language of the Personal Guarantee and the fact that it was part of Star Fuel's credit application, the Court finds that the language of the Personal Guarantee is not broad enough to encompass Musket's non-contractual tort claims.

Clifton and Selph further contend that they are entitled to summary judgment as to the guaranty claims because Musket does not allege Star Fuel has defaulted.  Having reviewed the filings in this case, the Court finds that Musket has clearly alleged that Star Fuel has defaulted.  Specifically, the Court finds that Musket has clearly alleged that Star Fuel has failed to pay for the

840,000 gallons of gasoline for which Musket contends Star Fuel is contractually obligated to pay. Accordingly, the Court finds Clifton and Selph are not entitled to summary judgment on this basis.

B.    Remaining Contractual Claim

The only contractual claim remaining in this case is Musket's breach of implied contract claim.  In their motion, Clifton and Selph alternatively contend that if the guaranty does cover Musket's remaining contractual claim, they are entitled to summary judgment as to that claim. Specifically, Clifton and Selph contend that Musket's breach of implied contract claim has been abrogated by this Court's September 12, 2011 Order granting Star Fuel's Motion for Partial Summary Judgment as to Musket's breach of contract claim and breach of Settlement Agreement claim.  Clifton and Selph further contend that Musket's implied contract claim is further rendered inoperative as a matter of law by virtue of its breach of express contract allegations.

Musket asserts that Clifton and Selph's arguments misconstrue the nature of Musket's breach of implied contract claim.  Musket contends that its breach of implied contract claim is not premised on Star Fuel's breach of the express obligation to purchase the 840,000 gallons of fuel pursuant to the unsigned gasoline contract but rather arises from Star Fuel's actual or implied agreement to share in the profits and losses on certain fuel transactions.  Musket further contends that this implied contractual obligation, to share in the profit (or loss) derived from these transactions, is neither subject to the Statute of Frauds nor addressed by the Court's prior order.

Under Oklahoma law, "an implied contract . . . is no less within the statute of frauds than is an express contract. . . ."  *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1387 (10th Cir. 1997).  Further, under Oklahoma law, "if an express contract between parties is established, a

contract covering the identical subject cannot be implied, because an implied agreement cannot coexist with the express contract." *Jones v. Univ. of Central Okla.*, 910 P.2d 987, 990 (Okla. 1995).

Thus, if Musket's implied contract claim was simply based upon Star Fuel's alleged breach of an implied contract to purchase the 840,000 gallons of fuel which was the subject of the unsigned gasoline contract, Clifton and Selph's arguments would be meritorious and they would be entitled to summary judgment. However, upon review of the parties' submissions, and particularly Musket's Third Amended Petition, the Court finds that Musket's implied contract claim is not based upon Star Fuel's alleged breach of an implied contract to purchase the 840,000 gallons of fuel but is based upon Star Fuel's alleged breach of an implied contract to share in the profits or losses on certain fuel transactions. Musket's implied contract claim, therefore, does not cover the identical subject of the express unsigned gasoline contract to purchase the 840,000 gallons of fuel, and said claim, thus, is not rendered inoperative as a matter of law by virtue of Musket's breach of express contract allegations.

Additionally, because Musket's breach of implied contract claim is based upon a different agreement than its breach of contract claim was based upon (an implied agreement to share in the profits or losses on certain fuel transactions versus an express unsigned gasoline contract to purchase 840,000 gallons of fuel), the Court finds that Musket's breach of implied contract claim has not been abrogated by this Court's September 12, 2011 Order. Further, the Court finds that in their motion, Clifton and Selph have not sufficiently shown that the alleged implied agreement to share in the profits or losses on certain fuel transactions is subject to the Statute of Frauds.

Accordingly, the Court finds that Clifton and Selph are not entitled to summary judgment on Musket's breach of implied contract claim.

C.      Fraud Claims

1.      Luitwieler's motion for summary judgment

In his motion, Luitwieler asserts that he is entitled to summary judgment as to Musket's fraud claims because Musket cannot establish justifiable reliance on the alleged misstatements or omissions by him.  The elements of actionable fraud are: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment." *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009). "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence." *Id.*  Further, plaintiff's reliance must be justifiable.  *See State ex rel. Sw. Bell Tel. Co. v. Brown*, 519 P.2d 491, 495 (Okla. 1974).

Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to Musket and viewing all reasonable inferences in Musket's favor, the Court finds Musket has set forth sufficient evidence to create a genuine issue of material fact as to whether its reliance on Luitwieler's alleged misrepresentations was justifiable.  Accordingly, the Court finds that Luitwieler is not entitled to summary judgment as to Musket's fraud claims.

2.      Musket's motion for partial summary judgment

In its motion, Musket moves for summary judgment as to its fraud claims arising out of the conduct occurring on and after September 12, 2008.  Specifically, Musket contends that Star Fuel is directly liable for constructive fraud based on its own fraudulent omissions in failing to correct Luitwieler's false representations and failing to disclose the entire truth regarding its intention to disclaim any obligation to purchase the 840,000 gallons of gasoline.  Alternatively, Musket contends

11

that, at a minimum, Star Fuel is vicariously liable for the damages caused by Luitwieler's fraudulent acts where those acts clearly occurred within the course and scope of his employment with Star Fuel. Finally, Musket contends that even if the fraud could possibly be considered to be outside the scope of Luitwieler's employment, Star Fuel's failure to correct this misinformation once it became aware of Luitwieler's conduct is sufficient to establish Star Fuel's ratification of that conduct.

In its response, Star Fuel first asserts that Musket's fraud claims are barred by the Statute of Frauds.  Specifically, Star Fuel contends that through its fraud claims, Musket is seeking to hold Star Fuel accountable for Luitwieler's alleged misstatements concerning the Fuel Purchase Agreement, an agreement that this Court has held to be unenforceable based upon its failure to comply with the Statute of Frauds.  However, Musket is not moving for summary judgment as to all of its fraud claims, but only as to its fraud claim arising out of the conduct occurring on and after September 12, 2008 – from Luitwieler's alleged fraudulent misrepresentations while he allegedly was a Star Fuel employee.  The Court finds this specific fraud claim does not encompass Luitwieler's alleged misstatements concerning the Fuel Purchase Agreement but encompasses separate, independent conduct that has not been addressed by the Court's prior order.  Accordingly, the Court finds that this particular fraud claim is not barred by the Statute of Frauds.  Star Fuel also contends that Musket could not have reasonably relied upon any statements made by Luitwieler.  As set forth above, the Court finds that there is a genuine issue of disputed fact as to whether any reliance by Musket on statements made by Luitwieler was justifiable.

Star Fuel also contends that Musket's constructive fraud claim in relation to conduct occurring on or after September 12, 2008 should be stricken since Musket's Third Amended Petition only alleges constructive fraud as to Star Fuel's alleged conduct during the settlement negotiations.

Having carefully reviewed Musket's Third Amended Petition, the Court finds that Musket has alleged a constructive fraud claim in relation to conduct occurring on or after September 12, 2008 through its ninth cause of action.  Accordingly, the Court finds that said claim should not be stricken.

Star Fuel also contends that Musket cannot establish constructive fraud because Musket has not established circumstances giving rise to a "special relationship" creating an affirmative duty to speak.  To recover under a theory of constructive fraud, a plaintiff must prove:

> (1) That the defendant owed plaintiff a duty of full disclosure.  This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff.  *This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter*;
>
> (2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;
>
> (3) That the defendant's misstatement or omission was material;
>
> (4) That plaintiff relied on defendant's material misstatement or omission; and
>
> (5) That plaintiff suffered damages as a result of defendant's material misstatement or omission.

*Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180-81 (10th Cir. 2008) (emphasis in original).  Further,

> [a] duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth.  One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.
>
> In determining whether there is a duty to speak, consideration must be given to the situation of the parties and matters with which they

13

are dealing.  If on account of peculiar circumstances there is a
positive duty on the part of one of the parties to a contract to speak,
and he remains silent to his benefit and to the detriment of the other
party, the failure to speak constitutes fraud.

*Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994)

(internal quotations and citations omitted).

Having carefully reviewed the parties' submissions, and viewing the evidence in the light

most favorable to Star Fuel and viewing all reasonable inferences in Star Fuel's favor, the Court

finds there is a genuine issue of material fact as to whether Star Fuel had a duty to speak.  In this

case, what was said by specific individuals, what certain individuals knew and did not know, what

certain individuals believed and intended, and the relationship between Luitwieler and Star Fuel are

all highly disputed issues.  Further, in this case, there is evidence to support both positions on these

issues.  Accordingly, the Court finds that Musket is not entitled to summary judgment on its

constructive fraud claim in relation to conduct occurring on or after September 12, 2008.

Star Fuel further contends that it is not vicariously liable for Luitwieler's alleged conduct.

Specifically, Star Fuel contends that Luitwieler's alleged statements concerning the 840,000 gallons

cannot be attributed to Star Fuel because Luitwieler acted alone, in his own self-interest and

arbitrarily sought to take the gas without Star Fuel's knowledge, approval, or consent.  Star Fuel

further contends that Luitwieler was not acting within the scope of his employment and that Musket

had a duty to inquire into the scope of Luitwieler's agency.  Having carefully reviewed the parties'

submissions, and viewing the evidence in the light most favorable to Star Fuel and viewing all

reasonable inferences in Star Fuel's favor, the Court finds Star Fuel has submitted sufficient

evidence to create a genuine issue as to whether Luitwieler was an employee/agent at the time of

his alleged fraudulent conduct and as to whether Luitwieler's conduct was committed in the course

of his employment or agency.  Accordingly, the Court finds Musket is not entitled to summary judgment as to its fraud claim in relation to conduct occurring on or after September 12, 2008 based upon vicarious liability.

Finally, Star Fuel contends that it did not ratify Luitwieler's conduct.

> Ratification must be with full knowledge of all facts.  In order that a ratification of an unauthorized act, or transaction, of any agent may be valid and binding, it is essential that the principal have full knowledge, at the time of the ratification, of all the material facts relative to the unauthorized transaction.

*Nowata Oil Syndicate v. Commercial Nat'l Bank*, 219 P. 339, 343 (Okla. 1923).  Having carefully reviewed the parties' submissions, the Court finds that there is a disputed issue of material fact as to whether Star Fuel had full knowledge of all the material facts relative to Luitwieler's conduct at the time of any alleged ratification.  Accordingly, the Court finds Musket is not entitled to summary judgment as to its fraud claim in relation to conduct occurring on or after September 12, 2008 based upon ratification.

    D.    <u>Misappropriation of Trade Secrets Claim</u>

To prevail on a claim that a defendant wrongfully appropriated trade secrets, a plaintiff must establish: (1) a trade secret existed, (2) the defendant acquired the trade secret through a confidential relationship, and (3) the defendant used the trade secret without authorization from the plaintiff.  *See Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 951 (10th Cir. 1978). Luitwieler contends he is entitled to summary judgment as to Musket's misappropriation of trade secrets claim because Musket has no genuine evidence to support the third element of its misappropriation claim – that Luitwieler actually used the trade secrets to Musket's detriment.

Having carefully reviewed the parties' submissions, and viewing the evidence in the light most favorable to Musket and viewing all reasonable inferences in Musket's favor, the Court finds Musket has submitted sufficient evidence to create a genuine issue as to whether Luitwieler actually used the trade secrets to Musket's detriment. Specifically, the Court finds that Musket has submitted evidence that many of the documents uploaded by Luitwieler contain highly confidential and proprietary trade secret information that would be competitively useful to Luitwieler during his employment with Star Fuel and could be used by Luitwieler and Star Fuel to directly compete with Musket. Additionally, Musket has submitted evidence that Luitwieler sent two of Musket's supplier contracts to Clifton and Selph. Further, Musket has submitted evidence showing that throughout his tenure at Star Fuel, Luitwieler used the IDrive "web restore" function to access a total of 79 Musket documents on 9 different occasions at unknown locations. Musket has also submitted evidence showing that Luitwieler organized a select portion of approximately 350 Musket files into a folder he named "Musket Folders," which contained additional subfolders with titles such as "Bus Dev," "Customer Setup," "Customers," "ETHANOL," "FORMS," and "Marketing Collateral."

Accordingly, the Court finds that Luitwieler is not entitled to summary judgment as to Musket's misappropriation of trade secrets claim.

E.     Breach of the Non-Disclosure Agreement Claim

As part of his employment with Musket, Luitwieler sign a Management Non-Disclosure and Assignment Agreement ("Non-Disclosure Agreement"). This Non-Disclosure Agreement prohibits Luitwieler from "directly or indirectly us[ing] or disclos[ing] to others, including a subsequent employer, any confidential or proprietary information . . . which may be entrusted to [him] or become known to [him] during [his] employment and which are not generally available to the

16

public." Non-Disclosure Agreement, attached as Exhibit 10 to Musket's Response to Defendant

Mark Luitwieler's Motion for Summary Judgment. Musket asserts that Luitwieler's uploading of

certain documents to the IDrive and his subsequent use and disclosure of those documents during

his employment with Star Fuel was a breach of the Non-Disclosure Agreement. Luitwieler contends

that Musket has no evidence to show that Luitwieler used and/or disclosed Musket's confidential

information and that Musket can show no damage or injury from this occurrence.

Having carefully reviewed the parties' submissions, and viewing the evidence in the light

most favorable to Musket, the Court finds that Musket has set forth sufficient evidence to create a

genuine issue as to whether Luitwieler used and/or disclosed Musket's confidential information and

as to whether Musket was injured as a result. As set forth above, Musket has submitted substantial

evidence from which it may be inferred that Luitwieler used Musket's confidential information that

he uploaded to his IDrive. Further, while the evidence submitted is substantially less, the Court

finds that Musket has also submitted sufficient evidence, albeit barely, indicating some injury to

Musket from Luitwieler's alleged breach of the Non-Disclosure Agreement.

Accordingly, the Court finds that Luitwieler is not entitled to summary judgment as to

Musket's breach of the Non-Disclosure Agreement claim.

F.     Unfair Competition Claim

In relation to Musket's unfair competition claim, Luitwieler asserts, as he did in relation to

Musket's breach of the Non-Disclosure Agreement claim, that Musket's unfair competition claim

fails as a matter of law for failure to show any use of the information from the IDrive or damage to

Musket from any such use. As set forth above, the Court finds that Musket has submitted sufficient

evidence to create a genuine issue as to whether Luitwieler used and/or disclosed Musket's

confidential information and as to whether Musket was injured as a result.  Accordingly, the Court

finds that Luitwieler is not entitled to summary judgment as to Musket's unfair competition claim.

>    G.      Violation of Computer Fraud & Abuse Act Claim

Musket alleges that Luitwieler violated the Computer Fraud and Abuse Act, 18 U.S.C. §

1030(a)(2).  That Act provides, in pertinent part:

> (a) Whoever –
> 
>        *       *       *
> 
>    (2) intentionally accesses a computer without authorization or
>    exceeds authorized access, and thereby obtains –
> 
>        *       *       *
> 
>       (C) information from any protected computer;
> 
>        *       *       *
> 
> shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(2)(C).  Further, the Act defines the term "exceeds authorized access" as "to

access a computer with authorization and to use such access to obtain or alter information in the

computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  "[A]n

individual who is authorized to use a computer for certain purposes but goes beyond those

limitations is considered by the [Computer Fraud and Abuse Act] as someone who has 'exceeded

authorized access.'" *Farmers Bank & Trust, N.A. v. Witthuhn*, Case No. 11-2011-JAR, 2011 WL

4857926, *5 (D. Kan. Oct. 13, 2011) (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133

(9th Cir. 2009)).

Luitwieler asserts that Musket cannot establish any evidence to support this claim.  Having

carefully reviewed the parties' submissions, the Court finds that Musket has submitted sufficient

evidence to create a genuine issue as to whether Luitwieler violated the Computer Fraud and Abuse

Act by exceeding his authorized access to his Musket computer and obtaining information from a

protected computer.  Specifically, Musket has produced its Employee Handbook which prohibits

18

Musket employees from downloading "Shareware" or "Freeware" software that may be available for download on the Internet, such as the IDrive software, without the prior knowledge and consent of the IT Department.  *See* Employee Handbook, attached as Exhibit 44 to Musket's Response to Defendant Mark Luitwieler's Motion for Summary Judgment, at 18-19.  It is undisputed that Luitwieler did not advise the IT Department prior to downloading the IDrive software nor obtain its consent.  Additionally, as set forth above, Luitwieler had also signed the Non-Disclosure Agreement, which prohibited the use or disclosure of any of Musket's confidential or proprietary information.

Accordingly, the Court finds that Luitwieler is not entitled to summary judgment as to Musket's violation of the Computer Fraud and Abuse Act claim.

IV.    Conclusion

For the reasons set forth above, the Court:

(A)    GRANTS IN PART and DENIES IN PART Clifton and Selph's Motion for Summary Judgment [docket no. 103] and FINDS that the language of the Personal Guarantee is broad enough to encompass Musket's contractual claims but that the language of the Personal Guarantee is not broad enough to encompass Musket's non-contractual tort claims;

(B)    DENIES Luitwieler's Motion for Summary Judgment [docket no. 101], and

(C)    DENIES plaintiff's Motion for Partial Summary Judgment [docket no. 106].

**IT IS SO ORDERED this 21st day of August, 2012.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE